# EXHIBIT 10

WILEY

# GSM AND UMTS

## The Creation of Global Mobile Communication

Edited by Friedhelm Hillebrand

Includes CD-ROM

LIVERPOOL
JOHN MOORES UNIVERSITY
AVRIL ROBARTS LRC
TEL. 0151 231 4022

Liverpool John Moores University
LEARNING & INFO SERVICES
Accession Number CT468069W
Class Number 621.38456 HIL
Site A M V

Books are to be returned on or before
the last date below.

7 – DAY
LOAN

23 SEP 2005

17 MAY 2006

WITHDRAWN

LIVERPOOL
JOHN MOORES UNIVERSITY
AVRIL ROBARTS LRC
TEL. 0151 231 4022

LIBREX

An accompanying CD is enclosed inside this book

LIVERPOOL
JOHN MOORES UNIVERSITY
AVRIL ROBARTS LRC
TEL. 0151 231 4022

LIVERPOOL JMU LIBRARY

3 1111 01050 6317

# GSM and UMTS

## The Creation of Global Mobile Communication

Edited by

**Friedhelm Hillebrand**
*Consulting Engineer, Germany*

With contributions from 37 key players involved in the work for GSM and UMTS

JOHN WILEY & SONS, LTD

Copyright © 2002 by John Wiley & Sons, Ltd
Baffins Lane, Chichester,
West Sussex, PO19 1UD, England
National 01243 779777
International (+44) 1243 779777

e-mail (for orders and customer service enquiries): cs-books@wiley.co.uk
Visit our Home Page on http://www.wiley.co.uk or http://www.wiley.com

Reprinted January 2002.

All Rights Reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, scanning or otherwise, except under the terms of the Copyright Designs and Patents Act 1988 or under the terms of a licence issued by the Copyright Licensing Agency, 90 Tottenham Court Road, London, W1P 9HE, UK, without the permission in writing of the Publisher, with the exception of any material supplied specifically for the purpose of being entered and executed on a computer system, for exclusive use by the purchaser of the publication.

Neither the author(s) nor John Wiley & Sons Ltd accept any responsibility or liability for loss or damage occasioned to any person or property through using the material, instructions, methods or ideas contained herein, or acting or refraining from acting as a result of such use. The author(s) and Publisher expressly disclaim all implied warranties, including merchantability of fitness for any particular purpose. There will be no duty on the authors or Publisher to correct any errors or defects in the software.

Designations used by companies to distinguish their products are often claimed as trademarks. In all instances where John Wiley & Sons is aware of a claim, the product names appear in initial capital or capital letters. Readers, however, should contact the appropriate companies for more complete information regarding trademarks and registration.

***Other Wiley Editorial Offices***

John Wiley & Sons, Inc., 605 Third Avenue,
New York, NY 10158-0012, USA

WILEY-VCH Verlag GmbH
Pappelallee 3, D-69469 Weinheim, Germany

John Wiley & Sons Australia Ltd, 33 Park Road, Milton,
Queensland 4064, Australia

John Wiley & Sons (Canada) Ltd, 22 Worcester Road
Rexdale, Ontario, M9W 1L1, Canada

John Wiley & Sons (Asia) Pte Ltd, 2 Clementi Loop #02-01,
Jin Xing Distripark, Singapore 129809

***Library of Congress Cataloging-in-Publication Data***

GSM and UMTS : the creation of global mobile communications / [edited by] Friedhelm Hillebrand.
p. cm.
Includes bibliographical references and index.
ISBN 0-470-84322-5
1. Global system for mobile communications. I. Hillebrand, Friedhelm.
TK5103.483 .G7496 2001
384.5′35–dc21
2001045565

***British Library Cataloguing in Publication Data***

A catalogue record for this book is available from the British Library

ISBN 0470 84322 5

Typeset in Times by Deerpark Publishing Services Ltd, Shannon, Ireland.
Printed and bound in Great Britain by T. J. International Ltd, Padstow, Cornwall.

This book is printed on acid-free paper responsibly manufactured from sustainable forestry, in which at least two trees are planted for each one used for paper production.

# Contents

**Chapter 1 GSM's Achievements** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**
*Friedhelm Hillebrand*
Section 1 Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Section 2 GSM and UMTS Milestones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 3 GSM Success Measured by Numbers . . . . . . . . . . . . . . . . . . . . . . . 7

**Chapter 2 The Agreement on the Concepts and the Basic Parameters of the GSM Standard (Mid-1982 to Mid-1987)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
Section 1 The Market Fragmentation in Europe and the CEPT Initiatives in 1982 . . . 11
*Thomas Haug*
Section 2 The GSM Standardisation Work 1982–1987 . . . . . . . . . . . . . . . . . . . . 15
*Thomas Haug*
Section 3 The Franco-German, Tripartite and Quadripartite Co-operation from 1984 to 1987 23
*Philippe Dupuis*
Section 4 The GSM Memorandum of Understanding the Engine that Pushed GSM to the Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
*Stephen Temple*
Section 5 The Role of the European Commission . . . . . . . . . . . . . . . . . . . . . . 52
*Philippe Dupuis*

**Chapter 3 The Detailed Specification Work Leading to the GSM Phase 1 Standard used for the Opening of Service (1987–1991)** . . . . . . . . . . . . . . . . . . . . . . . . . **57**
*Thomas Haug*

**Chapter 4 Consolidating GSM Phase 1 and Evolving the Services and System Features to GSM Phase 2 in ETSI SMG (1992–1995)**. . . . . . . . . . . . . . . . . . . . . . . **61**
*Philippe Dupuis*

**Chapter 5 Evolving the Services and System Features to Generation 2.5 by the GSM Phase 2+ Program (1993–2000)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **73**
Section 1 The GSM Phase 2+ Work in ETSI SMG from 1993 to 1996 . . . . . . . . . . 73
*Philippe Dupuis*
Section 2 The GSM Work in ETSI SMG from May 1996 to July 2000 . . . . . . . . . . 80
*Friedhelm Hillebrand*
Section 3 GSM Railway . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99
*Ansgar Bergmann*

**Chapter 6 GSM Goes to North America** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **105**
*Don Zelmer*

**Chapter 7 The UMTS Related Work of the European Commission, UMTS Taskforce, UMTS Forum and GSM Association** . . . . . . . . . . . . **115**
Section 1 The European Research . . . . . . . . . . . . 115
*João Schwarz da Silva*
Section 2 The European Regulation . . . . . . . . . . . . 128
*Ruprecht Niepold*
Section 3 The UMTS Taskforce . . . . . . . . . . . . 147
*Bosco Eduardo Fernandes*
Section 4 The UMTS Forum . . . . . . . . . . . . 156
*Thomas Beijer*
Section 5 Spectrum Aspects . . . . . . . . . . . . 165
*Josef Huber*

**Chapter 8 The UMTS Standardisation Work in ETSI** . . . . . . . . . . . . **179**
Section 1 The Initial Work in ETSI SMG (up to Spring 1996) . . . . . . . . . . . . 179
*Philippe Dupuis*
Section 2 The Creation of the UMTS Foundations in ETSI from April 1996 to February 1999 . . . . . . . . . . . . 184
*Friedhelm Hillebrand*

**Chapter 9 The Third Generation Partnership Project (3GPP)** . . . . . . . . . . . . **221**
Section 1 The Creation of 3GPP . . . . . . . . . . . . 221
*Karl Heinz Rosenbrock*
Section 2 UMTS in 3GPP (December 1998 to May 2001) . . . . . . . . . . . . 247
*Niels Peter Skov Andersen*

**Chapter 10 Services and Services' Capabilities** . . . . . . . . . . . . **263**
Section 1 The Early Years up to the Completion of the First Set of Specifications for Tendering of Infrastructure (1982 to March 1988) . . . . . . . . . . . . 263
*Friedhelm Hillebrand*
Section 2 The Years from Mid-1988 to early 2001 . . . . . . . . . . . . 286
*Alan Cox*

**Chapter 11 System Architecture Evolution** . . . . . . . . . . . . **301**
*Michel Mouly*

**Chapter 12 Radio Aspects** . . . . . . . . . . . . **309**
Section 1 The Early Years from 1985 to 1995 . . . . . . . . . . . . 309
*Didier Verhulst*
Section 2 The Development from 1995 to 2000 . . . . . . . . . . . . 319
*Michael Färber*

**Chapter 13 The Subscriber Identity Module: Past, Present and Future** . . . . . . . . **341**
*Klaus Vedder*

**Chapter 14 Voice Codecs** . . . . . . . . . . . . **371**
*Kari Järvinen*

**Chapter 15 Security Aspects** . . . . . . . . . . . . **385**
*Mike Walker and Timothy Wright*

Case 5:26-cv-07551-NW Document 77-11 Filed 05/13/26 Page 9 of 40 PageID #: 5451



**Chapter 16 Short Message and Data Services** . . . . . . . . . . . . . . . . . . . . . . . . **407**
Section 1 The Early Years up to the Completion of the First Set of Specifications in March 1988 for Tendering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 407
*Friedhelm Hillebrand*
Section 2 The Development from Mid-1988 to 2000 . . . . . . . . . . . . . . . . . . . . . 417
*Kevin Holley*
Section 3 General Packet Radio Service (GPRS) . . . . . . . . . . . . . . . . . . . . . . . 425
*Wolfgang Roth and Jürgen Baumann*

**Chapter 17 Mobile Stations Type Approval** . . . . . . . . . . . . . . . . . . . . . . . . . **431**
*Rémi Thomas and David Barnes*

**Chapter 18 Operation and Maintenance** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **445**
*Gisela Hertel*

**Chapter 19 Professional Technical Support and its Evolution** . . . . . . . . . . . . . . . **451**
Section 1 The PN in the CEPT Environment . . . . . . . . . . . . . . . . . . . . . . . . . 451
*Bernard Mallinder*
Section 2 PT12 and PT SMG in the ETSI Environment . . . . . . . . . . . . . . . . . . 453
*Ansgar Bergmann*
Section 3 MCC in the 3GPP and ETSI Environment . . . . . . . . . . . . . . . . . . . . 457
*Adrian Scrase*

**Chapter 20 Working Methods and their Evolution** . . . . . . . . . . . . . . . . . . . . . **463**
*Ansgar Bergmann*

**Chapter 21 The Contributions of the GSM Association** . . . . . . . . . . . . . . . . . . . **481**
Section 1 Co-operation of the Operators from the Agreement of the GSM MoU to the Opening of Service in 1991/1992 . . . . . . . . . . . . . . . . . . . . . . . . . . 481
*Renzo Failli*
Section 2 God Send Mobiles, the Experiences of an Operator Pioneer. . . . . . . . . . . 490
*George Schmitt*
Section 3 The Evolution from the Informal GSM MoU Group to the GSM Association from 1992 to 1998. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 495
*Arne Foxman*
Section 4 The Evolution of the GSM Association from 1998 to 2000 . . . . . . . . . . . 506
*Petter Bliksrud*
Section 5 The Work on Services Aspects . . . . . . . . . . . . . . . . . . . . . . . . . . . . 511
*Armin Toepfer*
Section 6 The Work on Data Interchange for International Roaming . . . . . . . . . . . 516
*Michael Gießler*
Section 7 The Third Generation Interest Group . . . . . . . . . . . . . . . . . . . . . . . . 525
*Neil Lilly*

**Chapter 22 GSM and UMTS Acceptance in the World**. . . . . . . . . . . . . . . . . . . . **531**
Section 1 Global Acceptance of GSM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 531
*Friedhelm Hillebrand*
Section 2 Global Acceptance of UMTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 542
*Bernd Eylert*

**Chapter 23 GSM Success Factors** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **547**
*Friedhelm Hillebrand*

Annex 1 Plenary Meetings of GSM, SMG, TSG SA, GSM MoU, GSMA . . . . . . . . . . 549

Annex 2 Organisation Evolution of the Technical Groups . . . . . . . . . . . . . . . . . . . 555

Annex 3 Lists of Chairpersons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 568

Annex 4 List of Key Abbreviations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 573

Index 577

List of Authors 581

# Chapter 13: The Subscriber Identity Module: Past, Present and Future

Klaus Vedder[1]

## 13.1 Introduction

Since its conception in 1988 the Subscriber Identity Module (SIM) has undergone continuous development extending its technical and functional capabilities. Initially, it was defined as a security module to authenticate the user to the network providing, at the same time, some very limited amount of memory for network and private user data. In those days, smart cards were still in their infancy. The technological and market requirements of GSM, its need for a global solution and its growing market power shaped the face of the SIM and changed the world of the smart card. Today's SIMs offer more than just security. They are a secure platform for operator defined services allowing operator differentiation by exploiting the power of the microcomputer in the SIM. All this could not have been achieved without the close co-operation of all parties involved in its standardisation.

## 13.2 The Committee

From a dozen participants at the first meetings in 1988 to about 70 delegates at the last meeting in January 2000 reflecting the growing importance of the SIM:

SIMEG, SMG9 "SIM Aspects" and SMG9 "IC Card Aspects".

Three names and only two chairmen for one committee which in 56 ordinary plenary and hundreds of working party and ad-hoc meetings:

- defined the Plug-in SIM, which has become the best-selling smart card;
- required the use of high temperature plastic material to support the new environment;
- specified new and advanced electrical and physical parameters such as low power consumption and the 3 V smart card interface; and
- advanced the SIM from a security and storage device to a secure platform for value added services.

[1] The views expressed in this chapter are those of the author and do not necessarily reflect the views of his affiliation entity.

The first meeting of the Subscriber Identity Module Expert Group (SIMEG) was hosted by the Dutch PTT in January 1988. SIMEG had been established as an expert group by GSM-WP1[2,3] to deal with all issues concerning the SIM and its interface to the mobile, thus covering a specific issue within the scope of its parent body, Working Party 1 (WP1), which was responsible for developing the GSM services. The first change in name and status was in April 1994 when, reflecting the importance of the SIM for the GSM system, the plenary meeting of TC SMG[4] held in Regensdorf, Switzerland "decided to raise the group of experts dealing with the specifications of the Subscriber Identity Module to the status of an STC". As a Sub Technical Committee (STC), SMG9 reported now directly to TC SMG, the technical committee responsible for the specification of GSM and UMTS.[5] SIMEG had become STC SMG9 "SIM Aspects". Four years later in June 1998, SMG9 changed its name from "SIM Aspects" to "IC Card Aspects". The scope of SMG9 had been extended to include work on smart cards of a generic nature which had been part of the responsibility of the disbanded TC ICC (Integrated Circuit Cards). With the foundation of the Third Generation Partnership Project (3GPP) in late 1998, the UMTS work of SMG9 was transferred to the USIM group within 3GPP and the future of SMG9 seemed to be quite predictable. It was assumed that all the work of SMG9 would, eventually, be transferred. The emerging need for a common smart card platform for the various mobile communication systems created a completely new scenario. SMG9 was "closed" by the ETSI Board on 29 March 2000 to be succeeded by ETSI Project Smart Card Platform (EP SCP). This committee inherited the generic work of SMG9 as part of its task to specify such a common smart card platform. The GSM specific work of SMG9 was handled by the new committee on an interim basis until a few months later, with the closure of TC SMG, all GSM work was transferred to 3GPP.

## 13.3 The Early Years

The first SIMEG plenary meeting in January 1988 was attended by nine delegates from France, Germany, The Netherlands and the UK. These countries formed the core of the plenary meetings of SIMEG for the first few years with Finland and Sweden contributing extensively through their work in ad-hoc meetings. The chairman of the first meeting was Gérard Mazziotto from France Telecom – CNET. He held this position for 5 years until his resignation at SIMEG#31 in March 1993. By then the number of delegates attending the usually 1 or 2 day plenary meetings had stabilised to around 20 from seven countries.

The plenary reports of those days often refer to the opinion of a national delegation. Industry experts attended courtesy of the (national) operators and only two industry delegates per country were allowed at a meeting. Industry contributions often stated the respective national administration as the source. This was, for instance, the case with the first document proposing what today is known as the Plug-in SIM. The description of a semi-permanent SIM

[2] Folder B4 of the attached CD ROM contains a content list covering all documents quoted in this chapter sorted according to footnote numbers. Folder B4 contains most documents quoted. For the others a folder number is given in the content list.

[3] GSM-WP1 217/87 rev1 (GSM 159/87): Draft terms of reference of the SIM expert group.

[4] With the inclusion of UMTS into its work program, ETSI TC GSM (the former Group Spécial Mobile) became the Technical Committee TC SMG (Special Mobile Group). GSM1 (the former GSM-WP1) became SMG1 etc. The first SMG plenary (SMG#1) was held in January 1992.

[5] Scope of SMG9 "SIM Aspects" in SMG 477/94: Terms of references of TC SMG and its STCs.

based on the IC card SIM was presented at SIMEG#5 in Munich in September 1988 by the author; it was sourced "Deutsche Bundespost".[6] This situation gradually changed and, with the transfer of the GSM specification work from the European Post and Telecommunication Authorities (CEPT) to ETSI in the summer of 1989, industry could attend the meetings in their own right.

The first years were obviously dominated by the need to specify the basic functionality and physical features of the SIM and its interface to the mobile. The original role of the SIM was that of a security device as defined in the report of SIMEG#1[7]:

> A SIM is the physically secured module which contains the IMSI, an authentication algorithm, the authentication key and other (security related) information and functions. The basic function of the SIM is to authenticate the subscriber identity in order to prevent misuse of the MS (Mobile Station) and the network.

This understanding of the function of the SIM underwent quite an evolutionary process which was, however, not always reflected in the requirement specification, GSM 02.17 *Subscriber Identity Modules (SIM), functional characteristics*. There was often the question of what was first: the technical realisation of a feature or the definition of the functional requirement. Though the document was revised intensively several times, it is no easy reading to gain an overview of the full functionality of the SIM.

## 13.4 Functionality, Form and Interface

To fulfil its role as an authentication device bringing a new dimension of security to mobile communication networks,[8] the SIM had to be able to execute internally the operator specific authentication algorithm (A3) and to store securely the subscriber specific key (Ki) and other parameters needed for this task. Additional functionality, the physical forms of the SIM and its interface to the mobile were the three main topics for quite a few years.

### *13.4.1 Functionality*

At the third meeting in May 1988, SIMEG discussed for the first time that the SIM should also store data related to services and not only those data necessary for the security functions. Advice on this issue as well as on the creation of a new specification on SIM communication – which was later to become GSM 11.11 – was sought from the parent committee. GSM-WP1 supported the request from SIMEG and decided that the SIM should offer the capability to store information elements for the following features: Short Message Service (SMS), Advice of Charge (AoC), Abbreviated Dialling Numbers (ADN), Fixed Dialling Numbers (FDN), barring of outgoing calls, pre-programmed PLMN selector and language of announcement.[9] New data-fields on the SIM as well as new procedures for the interface between the SIM and the Mobile Equipment (ME) needed to be specified, while the constraints imposed by the memory provided by the special chips used in a SIM were a constant source for discussion.

[6] SIMEG 72/88: Semi-permanent SIM.
[7] SIMEG 28/88: Report of the 1st SIMEG meeting, The Hague, 19-20 January 1988.
[8] See Chapter 15: Security.
[9] WP1 162/88, SIMEG 47/88: Letter from WP1 at SIMEG#4.

### 13.4.1.1 The Influence of the Memory

Memory was a scarce resource. The chips of those days offered less than 10 kbytes of memory in total. Though the functionality and internal organisation of the chip in a SIM with its own CPU and on-board memory is comparable to a PC, it is not surprising that the performance of such a microprocessor chip is limited. State of the art chips had about 6 kbytes of mask-programmed Read Only Memory (ROM). This type of memory is used for data which are the same for a large number of cards as it cannot be changed. It typically contains the operating system and the GSM application including authentication algorithm(s) and application protocol. The 2–3 kbytes of programmable memory, so-called EEPROM, would hold all the subscription and user (thus SIM) specific data such as the IMSI[10] and the secret, subscription specific key (Ki) for the authentication of the subscriber to the network as well as all the subscriber information now to be stored in the SIM. A typical SIM of those days supported the storage of about 20 abbreviated dialling numbers with 6-10 characters for each name and five short messages in addition to those data. The Random Access Memory (RAM) which is the "working memory" was not even big enough to store all of a short message when this was transferred from the memory in the mobile equipment to the EEPROM in the SIM. The skills of the engineers when writing SIM software were constantly challenged and more than once it was a question of just a few bytes as to whether an extension of the functionality would fit on the chip or further optimisation of all the software would be required.

Neither the huge success of GSM, nor the role of the SIM as the driving force for the smart card industry were foreseen in those days, rather the opposite opinion prevailed. The attitude of "order a few million microprocessor chips and we may think about developing a product" may have been an extreme position around the turn of the 1990s but certainly an indication of the general feeling. So it is not surprising that chip manufacturers were reluctant to introduce new technologies and that it took until the mid-1990s for chips with just 8 kbytes of EEPROM to become available. Those chips offered storage for about 100 abbreviated dialling numbers and 20 short messages. The tremendous increase in the number of GSM subscribers at that time and GSM becoming by far the largest smart card consumer had a significant impact on the development of new smart card chips. Today's chips offer over 100 kbytes of ROM, 64 kbytes of programmable memory, a few kbytes of RAM and often extra hardware for the execution of public key algorithms. This makes, in particular, the implementation of public key solutions for mobile commerce now a reality. Furthermore, the introduction of new types of memory such as flash memory will break up the "historic" separation into ROM and EEPROM and lead to new ways in the handling of SIMs and its software management.

### 13.4.1.2 PIN Management and Other New Security Features

March 1988 (SIMEG#2) saw the cipher key generation algorithm (A8) become part of the security functionality of the SIM. A8 generates the cipher key, Kc, which is then used by the cipher algorithm (A5) residing in the ME for the ciphering of the radio interface. It was now up to the operator, as the party responsible for the SIM, to choose the algorithm and thus the quality of the cipher key, Kc. Typically, A8 and the authentication algorithm A3 are combined into one algorithm denoted by A3/8. As 10 of the 64 bits of Kc were set to zero the "effective key length" was 54 bits (though from a cryptographic point of view a key with

[10] IMSI: International Mobile Subscriber Identity. This number uniquely identifies a network and the subscriber.

several bits set to zero is not necessarily more "effective" than a "full length" 64 bit key). As the mobile and the base station system were not supposed to manipulate Kc but use it as received from the SIM and the Authentication Centre of the subscriber's home network respectively, the "effective key length" could be controlled by the operator. Some equipment manufacturers had, however, interpreted the specifications differently. The issue was finally clarified by SMG#30 in November 1999 where the original meaning was confirmed.

User access to the SIM as a medium to provide GSM service is controlled by a Personal Identification Number (PIN). This number can be changed and freely chosen by the user within the range of 4-8 digits. The introduction of new features created a new security scenario as the user of the SIM might not be the subscriber. Typical examples at the time were lorry drivers using SIMs with fixed dialling numbers controlled by the fleet manager and SIMs supporting advice of charge with a spending limit set in the card by a parent. As the driver should not necessarily be able to edit the numbers or the child to reset the spending limit, a "super-PIN" needed to be specified to protect the contents of the new data-fields against unauthorised changes. As neither of these two features was completed for phase 1, the super-PIN became a phase 2 item. Before its introduction in September 1991 at SIMEG#23, it was renamed PIN2 to emphasise the fact that it was not superior to the normal PIN, but of a similar nature, accessing data-fields compared with accessing an application.

PIN Unblocking Keys (PUKs) had been introduced by SIMEG as another hitherto unknown feature. The PUK provides the user with a means to reactivate the corresponding PIN which had previously been blocked by wrong PIN entries. The actual process of keying in a PIN with the subsequent verification by the SIM is, however, not mandated by the specifications. These allow disabling of the check of the PIN altogether (though not of PIN2) subject to the discretion of the operator who has to find the right balance between security and ease of use for its specific clientele or group of subscribers. As this feature is programmed during the personalisation of the SIM, it can be set on a per SIM basis as specified by the operator.

An interesting interaction between PIN check and security is the order in which the PIN check and the authentication of the SIM by the network are performed. Doing the PIN check first, as introduced by SIMEG#32 in May 1993, has two advantages. The prompt for the user to key in the PIN comes immediately after the mobile has been switched on, and not after the log-on to the network which may take some time in particular when roaming. It also mitigates the possibility of a cryptographic attack against the (SIM specific) secret subscriber authentication key of a stolen SIM as the correct PIN of the "interrogated" SIM would have to be presented to the SIM prior to the delivery of the authentication challenges (unless the PIN check is disabled). Such attacks briefly surfaced in spring 1998.[11]

### *13.4.2 Physical Form or Realisation of the SIM*

The functional splitting of the MS into ME and SIM was described in GSM-WP1 document 173/87.[12] Three different types of SIMs had been identified for specification: fixed, removable and contained in an IC card.

[11] SMG 475/98: Statement by SMG9 and SMG10 chairmen; see also Chapter 15: Security.
[12] GSM-WP1 173/87: Functional Split of MS into ME and SIM.

#### 13.4.2.1 The ID-1 Card

The first mobile network to employ a smart card for the authentication of the subscriber to the network was the analogue network Netz-C of the Deutsche Bundespost (later Deutsche Telekom). This subscriber card had evolved from a "magstripe device" just like a credit card, via a card having a memory chip containing the subscription details, to an IC card containing a microprocessor chip for authentication and other purposes. As such smart cards were already deployed in the field, it was not surprising that this solution was also adopted for GSM.

Looking at it from today's perspective, it is interesting to note how much time was devoted to certain aspects of the IC card or ID-1 SIM (ID-1 is the standardised name for cards having this format). It was generally assumed that most SIMs would have this format and that they might also be used as, say a payment card outside the mobile.

For this reason ID-1 SIMs were allowed to be embossed like a credit card and even today the slot of an ME supporting an ID-1 SIM has to be designed to cater for an embossed SIM. No such SIM saw a subscriber. With the change of the business model, the SIM manufacturers stopped the extensive and mostly unsuccessful testing. The new card material needed to satisfy the high temperature requirements of GSM imposed on the SIM, was not really suited for embossing. The tests resulted, in most cases, in pretty warped cards.

A much discussed and thought to be typical scenario for the SIM was its use in a car phone. How much contact pressure needed to be exerted by the card reader in the phone to the SIM contact area so that communication between the card and the car phone would work under "extreme driving conditions"? It was also assumed that people might own a SIM and no phone, or just travel with a SIM. A subscriber enters a taxi, which has a GSM phone in the boot with an in-built plug-in SIM, and uses his or her own ID-1 SIM in the telephone receiver in the back of the taxi to make a call to be charged to this SIM. These thoughts and scenarios are behind the requirement that an ID-1 SIM takes precedence over the plug-in SIM as stated in GSM 02.17 until June 1998 when, in connection with the specification of a second card reader driven by the SIM application toolkit, the choice for the precedence was left to the user. Interestingly enough, similar ideas are now discussed by 3GPP for car pooling and access to multi-media devices from each seat in a car.[13]

The reality was different. More and more ID-1 SIMs were delivered "pre-punched" so that the user could break out the plug-in SIM. Though overall market figures are not available, it can be deduced from the numbers of a major operator that as early as 1995 the number of pre-punched SIMs exceeded the number of ID-1 SIMs, with this number approaching nearly 100% of the total SIM market in 1998.

These were also the days of the manufacturers of punching machines and Plug-in adapters whose products transformed ID-1 SIMs into Plug-in SIMs and vice versa. These adapters were clearly outside the relevant GSM specifications with respect to thickness, bending and torsion. Nevertheless, they were widely used. SMG9 was even asked by the Terminal Working Group (TWG) of the GSM MoU to specify an adapter. This was rejected by the SMG9 plenary meeting in March 1996 on grounds of violation of its core documents and potential liability issues. Also outside the GSM specifications was the use of a "pre-punched" SIM as an ID-1 SIM in a mobile requiring the latter. Special punchings were, however, developed around 1996 to minimise the risk of damaging the card reader in the mobile when a pre-

[13] TP-010066: UE functionality split over physical devices, TSG-T#11, Palm Springs, March 2001.

punched SIM was inserted or removed. The potential damage consisted of the contacts of the card reader falling into the gap between the plug-in part and the remaining part of the ID-1 SIM thus getting torn, resulting in an unusable telephone. Operators had quite an interest in such solutions as this drastically reduced their logistic problems and cost – one instead of two types of SIM.

#### 13.4.2.2 The Fixed Solution

The "fixed" SIM was a major topic at SIMEG#2 in March 1988.[14] This solution meant that all functions of the SIM including the (secret) operator specific authentication algorithm and the secret subscription specific key used for the authentication of the subscriber, would be an integral, thus fixed, part of the mobile. Such mobiles would be operator and even subscriber specific.

SIMEG agreed that this solution would have severe disadvantages with respect to flexibility and security. Apart from the question of whether secret keys could be stored securely in a mobile, considering all the issues around the storage of the IMEI, a fixed solution would require a loading mechanism for the authentication algorithm and the secret subscriber key as well as a mechanism to replace such an algorithm or the original key. These concerns were also expressed in a letter to SIMEG by MoU-BARG, the billing and accounting rapporteur group within the GSM MoU.[15] The letter further points out "the commercial impact of the fixed SIM solution with respect to the possibility of free trade with mobile equipment. ... Thus (commercial) barriers would be raised in relation to the trade of mobile equipment." Other concerns were related to potential security issues when a mobile was repaired and to the handling of personal user data when the subscriber replaced the mobile. GSM-WP1 followed the conclusions of SIMEG and the concept of the fixed SIM was dropped altogether in early 1988.

#### 13.4.2.3 The Plug-in SIM

The form of the removable plug-in SIM was discussed quite controversially for nearly 9 months while agreement on the lower layers had already been reached at SIMEG#3: "The electrical and logical interfaces for IC card SIMs and plug-in SIMs will be identical in principal, and according to ISO 7816". The ISO/IEC 7816[16] series of standards forms the core reference for all smart card applications.

The first proposals for the physical form of the plug-in SIM were discussed at the two following meetings where the UK and Germany presented their solutions. The first proposal by the UK, later modified to a more compact 28 pin J-lead package, was the use of existing electronic components in the form of a 24 pin DIL socket with only eight pins connected as ISO 7816 specified just eight contacts. In the German proposal already mentioned above, the plug-

[14] SIMEG 43/88: Report of the 2nd SIMEG meeting, Paris, 16-17 March 1988.

[15] SIMEG 12/88: Letter from MoU-BARG meeting to SIMEG (prior to the foundation of the GSM association, the GSM operators were organised within the GSM MoU – the name derived from their memorandum of understanding).

[16] ISO: International Organisation for Standardization; IEC: International Electrotechnical Commission. ISO/IEC 7816, Information technology – Identification cards – Integrated circuit(s) cards with contacts. Prior to the formation of the Joint Technical Committee 1 (JTC1), Information technology by ISO and IEC in 1988 these standards were published by ISO and still today people refer to them as ISO standards.

Case 5:26-cv-07551-NW Document 77-11 Filed 05/13/26 Page 18 of 40 PageID #: 5460



in SIM was a "cut-down IC card" obtained by simply cutting away the "excessive" plastic of an ID-1 SIM and thus reducing the size to 25 × 15 mm. This realisation would allow the use of existing technology for production and personalisation and the interface to the ME would be identical to the that of the ID-1 card.

The discussions about the advantages and disadvantages of the two proposals centred sometimes around interesting aspects of removable, though potentially rarely removed components. Concerns were raised about the handling of the cut-out version which was, however, equally applicable to a DIL package. Would a little tool coming with the DIL package and similar to the one used by a dentist for testing a filling, satisfy the requirement in Recommendation GSM 02.17 that the SIM is a removable module which can (easily) be inserted and removed by the subscriber? Would the consistent pressure and connection cause gold wandering between the contacts of the cut-out version and the card reader? It was clarified that voltage and current would clearly not be high enough to cause any such problem.

As GSM-WP1 wanted the final say in this issue, SIMEG was requested to elaborate a decision document outlining the advantages and disadvantages of the two proposals. Respective documents were elaborated by both delegations but in the end not required. The matter was resolved by SIMEG itself at its eighth plenary meeting which took place in Issy-les-Moulineaux (Paris) in January 1989. As no delegation no longer supported the 24 pin DIL package or the modified proposal, unanimous agreement was reached in favour of the cut-out version. GSM-WP1 endorsed the proposal at its meeting in Madrid a month later in February. The statement about the SIM being a removable module was also clarified at that meeting for the Plug-in SIM by inserting the following text in GSM 02.17: "It is intended to be semi-permanently installed in the ME". The precise meaning of "semi-permanently" was left to the manufacturers who have come up with a lot of good and compact solutions since then (Figure 13.1).




**Figure 1.3.1** Early (hand-made) samples of Plug-in SIMs

The final form of the Plug-in SIM realises the UK proposal that the Plug-in SIM shall be positioned in the mobile by means of a cut-off corner and not by a hole, as originally proposed. This simplified the manufacturing process and SIMEG#10 agreed on the final form as contained in document SIMEG 60/89 for incorporation into GSM 11.11.[17]

#### 13.4.2.4 Mini-SIM and Mini-DAM

In September 1990, the Association of European PCN Operators[18] proposed a third size for the SIM card, a third of the size of the ID-1 SIM: "Large enough to be frequently insertable and removable by handset end users. The ability to do this easily and reliably will maximise smart card use. … Small enough to not impact on handset design and shape/style."[19] This mini-smart card appeared in the report of SIMEG#20 in January 1991 as a phase 2 work item only to be removed from the same by the GSM1 meeting in Bonn as reported at SIMEG#22 in May 1991.

The idea resurfaced in September of that year with an explicit reference to the mini-card of the DCS 1800 operators as one of the requirements for the realisation of the DECT Authentication Module (DAM).[20] The concept of this module was similar to that of the SIM with the actual specification work commencing in October 1991 in an expert group chaired by me. The dimensions of the mini-DAM were different to the original proposal of the DCS 1800 operators. The size of the Paris metro ticket competed with a card of dimensions 66×33 mm being the top left part of an ID-1 DAM (or SIM). The latter was eventually chosen as it allowed to construct card readers which could accept both an ID-1 DAM and a mini-DAM. The fate of a third card size was finally sealed in early 1994. For reasons of compatibility with GSM, the mini-DAM was dropped from the specification in response to requests by the national standards bodies of France and the UK made in the public enquiry preceding the publication of the DAM as a European telecommunication standard.[21] The DAM group rejected the additional French request to delete the plug-in DAM. Among the reasons given for the deletion were "the difficulty in handling the plug-in", "printing restrictions" and that "the state-of-the-art in GSM handsets shows that it is no more a problem to integrate an ID-1 card in the handset as some mobile manufacturers provides now a full ID-1 card interface (as) part of the original design". To follow the request would have been a de-alignment with GSM, also affecting the planned DECT-GSM interworking.

### *13.4.3 GSM 11.11 – The SIM-ME Interface Specification*

Would the functionality of the SIM laid down in GSM 02.17 not be sufficient for operators to write their own interface specifications based on the relevant international standards of ISO/IEC for smart cards? It certainly would, but, what about interoperability? International standards often contain numerous options due to the wide range of applications they have to

[17] SIMEG 45/89: Proposal for outline of semi-permanent SIM; SIMEG 60/89: Plug-in SIM (drawing).
[18] Personal Communications Network, later DCS 1800 (Digital Cellular System 1800) and then GSM 1800.
[19] GSM1 171/90: Mini smart card.
[20] RES 3S 37/91: Requirements for DECT authentication module specification. DECT: Digital Enhanced (then European) Cordless Telecommunications.
[21] ETSI Public Enquiry (PE 47) closing 31 December 1993. The DAM specification was published as the European Telecommunication Standard "ETS 300 331, Radio Equipment and Systems (RES); Digital European Cordless Telecommunications (DECT); DECT Authentication Module (DAM)" only in November 1995.

cater for, and to the conflicting interests of the parties involved in their creation. There is usually no specific application driving the standardisation process. It is thus not too difficult to specify smart card systems which are fully compliant with the same international standards but not compatible with each other.

Rephrasing the question highlights the issue and one of the factors behind the success of GSM:

- Shall every SIM work in every mobile independently of the issuing operator, the mobile manufacturer and the SIM manufacturer and thus enable a global market for mobiles; or
- Shall there be operator specific mobiles, at least from a software point of view, and thus a fragmentation of the mobile market?

The third SIMEG plenary in May 1988 agreed to seek advice from its parent committee on the creation of a new specification on SIM communication. At the following SIMEG meeting it was reported that GSM had created "Recommendation GSM 11.11: SIM specifications" to "define the internal logical organisation of SIMs and it specifies its interface with the outside world. As a consequence, this recommendation also specifies the part of the ME which communicates with the SIM." For years to come the work of SIMEG was dominated by the completion and the enhancements of this document. The first milestone was the finalisation of the phase1 version. Phase 1 documents were going to be frozen in early 1990 as the first networks were supposed to go on air in mid-1991. To achieve this milestone and to advance the document to a stable level, numerous specialised meetings were called for.

#### 13.4.3.1 The Electrical Interface and the Environment

One major issue was the communication protocol itself. Not surprisingly, the battles known from ISO/IEC were also fought out at SIMEG. The French delegation promoted "their" byte or character-oriented transmission protocol T = 0, the German delegation tried to introduce the block-oriented T = 1 protocol. It was a lost cause. T = 0 had been specified in the first edition of ISO/IEC 7816-3 "Electronic Signals and Transmission Protocols" in 1989, the core document for all smart card work, while T = 1 was published only in 1993 when the GSM system was already up and running. As a compromise SIMEG had agreed that "The transmission protocols to be used between SIM and ME shall at least include the choice of the character per character protocol specified and denoted by T = 0 in IS 7816-3".[22] This left it open to manufacturers to include, in addition to T = 0, the transmission protocol T = 1. With such a wording, it is inevitable that no SIM or ME ever had the choice to communicate with their counterpart by means of T = 1. Eleven years later, the support of both protocols became mandatory for all terminals being compliant with the new smart card platform specification. The choice is now left to the application on the card (such as a USIM) which may communicate with the terminal using either protocol.

SIMEG#9 also saw the first deviation of an electrical parameter from the core standard. In recognition of the special environment of mobile communication with a limited power supply, SIMEG restricted the maximum power consumption of a SIM to 10 mA, compared with 200 mA then allowed by ISO/IEC 7816-3. The requirement was a challenge to chip manufacturers, in particular when incorporating special, power consuming hardware to support public key cryptography. The challenges were solved. Also the other new parameters

[22] SIMEG 83/89: Report of the 9th SIMEG meeting, The Hague, 29-30 March 1989.

Case 5:26-cv-07551-NW Document 77-11 Filed 05/13/26 Page 21 of 40 PageID #: 5463



such as extended tolerances for the voltage supply and the duty cycle have become industry standard by now and were incorporated into the second edition of the core standard, ISO/IEC 7816-3, which was published in 1997.

The environment – a mobile lying on the dashboard of a car in the heat of the day in the Sicilian summer – caused long discussions about the temperature resistance of SIMs. While this situation did not look like too much of a problem for the chip itself fears were expressed that the large cards may warp and get stuck in the mobile while the Plug-in SIMs might just melt away inside the mobile. The standard material for credit cards in those days and today is PVC, not known for a high temperature resistance. Agreement was finally reached in the SIMEG plenary forcing manufacturers to invest in new material satisfying the higher requirements of GSM set at 70°C with "occasional peaks of up to 85°C".

#### 13.4.3.2 The First Version of GSM 11.11

"SIMEG agrees to present the draft of Recommendation GSM 11.11… for approval as it was asked by GSM. However, it is a common view in SIMEG that this recommendation is far to be complete, especially further editorial improvements will be necessary." This disclaimer contained in the meeting report of SIMEG#10 held in May 1989 did, however, not deter the approval of the document by GSM#23 in Rønneby. Industry needed a stable basis on which to develop its implementations. All further changes to GSM 11.11 had now to be approved by the GSM plenary. The meeting in Rønneby was, incidentally, the first meeting of GSM as a Technical Committee (TC) of the European Telecommunications Standards Institute (ETSI).

### *13.4.4 Future Work of SIMEG*

With the approval of GSM 11.11, the question was raised what the future tasks of SIMEG were to be. Clearly, the specification had to be completed and bugs had to be fixed. What else? The specification of type approval procedures for the SIM was not going to be one of these tasks, as SIMEG received its directives from GSM-WP1 and GSM, and neither of the two were in favour of type approval, which they considered to be a matter for the GSM MoU. The SIM-ME interface tests specified for the type approval of the ME were done by a different group. So the house had been built by July 1989 and only a few issues remained:[23]

> It is clear that the main task of SIMEG in the future will remain the management of Recommendations GSM 02.17 and GSM 11.11. However it seems that GSM and MoU network operators might need some expertise from SIMEG as it concerns the definition of acceptance tests for the SIM and the elaboration of SIM administrative management procedures. It is clear that such expertise could be provided by reports to GSM, for guidance only, and not as mandatory implementation. … Concerning the administrative management of the SIM, it is recognised that the parts of Recommendation 11.11 which deal with the administrative procedures cannot lead to any type of approval tests for the ME. Since there is no SIM type approval, they will never be checked. … SIMEG agreed that a consistent report on all administrative management of SIM is necessary before taking any decision about changing GSM 11.11.

One of the very first changes to GSM 11.11 was the removal of all those sections purely related to the administrative management phase of the SIM. Some operators considered the personalisation of SIMs their very own matter and outside the scope of the GSM committee.

[23] SIMEG 143/89: Report of the 11th SIMEG meeting, Lund, 18-19 July 1989.

They pursued their own, sometimes quite elaborate procedures. In June 1994, problems in the field forced at least the inclusion of an informative annex in GSM 11.11 containing recommended default values for the coding of data-fields at personalisation. Some pre-settings of, in particular, the ciphering key, Kc, in brand-new SIMs had just not worked in some mobiles. It took a further 5 years until, in 1999, SMG9 started, as part of its mandate for generic smart card specifications, work on a document containing administrative commands and functions for IC cards. The "standardless" time resulted in manufacturers implementing proprietary commands and features for the personalisation of SIMs and their administration over the air. Software developed for the personalisation of SIMs of one manufacturer could consequentially not be used for personalising those of another supplier.

Removal of the administrative sections, technical enhancements and correction of errors, observable in nearly 50 Change Requests (CRs), were the topics until GSM 11.11 was "frozen" for phase 1 (i.e. no new technical features, only error fixing) by GSM#26 in Sophia Antipolis in March 1990.

## 13.5 Phase 2

By May 1990, SIMEG had compiled a first list of work to be done for GSM phase 2. Apart from the maintenance of the "frozen" GSM 02.17 and GSM 11.11 specifications, SIMEG intended to introduce 3 V technology and "discuss and specify SIM requirements which have already been discussed during the phase 1 specification work, but are not fully specified in the recommendations up to now". These included fixed dialling numbers, the advice of charge feature and the "super-PIN" already discussed above.

SIMEG believed that, given more time, a SIM based solution could be found to satisfy the need of the operators for fixed dialling numbers. This time was indeed needed. A phase 1 mobile would not understand this feature and would allow the user to make any call, not just to those numbers listed in the SIM. A mechanism had to be invented which would prevent the use of a fixed dialling SIM in such a mobile. Though the task sounded fairly easy, a data-field specifying the phase of a SIM was a mandatory phase 2 feature, the technical realisation grew more and more complex with the years. It took until December 1992 when a CR to introduce the required functionality in GSM 11.11 was finally agreed by SIMEG#29. This solution does not use any information about the phase of the mobile or the SIM. The SIM is invalidated at the end of a GSM session and will refuse to work by denying access to its IMSI which is needed for the authentication procedure of the SIM to the network. Only a mobile supporting the mechanism can "rehabilitate" such a SIM.

In January of that year SIMEG celebrated its fourth anniversary at its 25th plenary meeting. The meeting was hosted by France Telecom in Paris who "were happy to offer to the SIMEG participants during the meeting free operational national and international calls through the GSM experimental network infrastructure". By that meeting SIMEG had about completed the work on the advice of charge feature including a field for the coding of the currency. The usefulness of this feature for purposes other than advice was still a matter of concern. The statement in the report of SIMEG#4 that the accuracy of the AoC counter may not be sufficient as the SIM might be removed during a call (or the open interface between the SIM and the ME might be manipulated maliciously) was still valid. One such attack was the insertion of a thin piece of foil between the contacts of an ID-1 SIM and those of the card reader in the mobile. This attack foiled quite a few of the mechanical or other devices all

Case 5:26-cv-07551-NW Document 77-11 Filed 05/13/26 Page 23 of 40 PageID #: 5465


mobiles were required to have to detect the removal of a SIM. To counteract such attacks an additional electrical and logical check was specified in August 1993.

### *13.5.1 The Incorporation of DCS 1800*

In June 1990, SIMEG welcomed for the first time a delegate from a DCS 1800 operator. In December of that year, a proposal was presented to incorporate DCS 1800 on the GSM-SIM though as a completely separate application. This would allow plastic roaming between GSM 900 and DCS 1800 operators. One and the same SIM could be used in both systems. The proposal did not meet with general enthusiasm. A statement made at the meeting emphasised the fact that the decision of whether to issue cards supporting both systems would remain a decision of each network operator. No requirement was foreseen for a common GSM-DCS SIM for phase 1, these would still be two totally separate SIMs. The data-fields of the DCS 1800 directory in the phase 2 SIM would mirror those of GSM with the exception of the BCCH coding. Differences between GSM 11.11 and the DCS requirements were going to be contained in a phase 1 delta specification.

With the acceptance of DCS as part of the GSM community, roaming between such networks became an issue. SIMEG was to look into this for phase 2+ from a SIM point of view. The easiest solution seemed to be to abolish DCS 1800 as a separate application and to merge it into the GSM directory on the SIM. The operating system of the SIM could take care of backwards compatibility issues by pretending to support the DCS application on the SIM. The task sounds far more complex than it actually was. The only action required was the translation between the DCS and the GSM identifiers in the communication with a DCS mobile. The solution would even work with a phase 1 DCS mobile. This suggestion made by the author at the SMG1 meeting in Helsinki in August 1993 was eventually accepted by SMG at its meeting in Regensdorf in April 1994 for phase 2. It had been clarified in the meantime that there would be no problem if the BCCH parameters for both systems would be stored in one and the same data-field. At the meeting itself objections were, however, raised to allow the manipulation of the identifiers by the SIM operating system as such methods were not "in line" with the international standards of ISO/IEC. As the proposal met with broad support from, in particular, other operators and such a behaviour of the operating system was not "outlawed", a compromise was reached and a new specification was written during the plenary.[24] As before, the operating system could ignore a DCS mobile, manipulate the identifiers, or, as a new third solution, store them in the rudimentary directory specified in the new document. The author does not know of any implementation of the third solution, as it was consuming several hundred bytes of scarce memory and the switching between the directories could cause security problems in SIMs supporting fixed number dialling.

### *13.5.2 Aligning the SIM with the DAM*

When looking at a phase 1 or an early phase 2 version of GSM 11.11 it is not immediately obvious that they are just a previous edition of today's document. GSM 11.11 had grown from a collection of input papers in a natural way to a core specification. The necessity to improve the document editorially was already seen at SIMEG#21 and several attempts were made and failed. A major obstacle proved the language itself. Improving just the language required

[24] GSM 09.91: Interworking aspects of the SIM/ME interface between phase 1 and phase 2.

detailed technical background. The editorial update was only one issue, the other issue was the harmonisation and alignment with the specifications developed by TE9 (see below). So in July 1992, SIMEG#28 set up an alignment group for this task which consisted of a handful of experts. The group was also to take into account the work done for the DAM specification as this had been modelled after the respective TE9 document. The group chose to completely rewrite GSM 11.11 based on the DAM specification.[25] The editorial cleaning had become a review process as well. While the inconsistencies were tabled as CRs to the existing version, the group had incorporated them into the new version assuming they would be approved by the SMG plenary. This way, the "new style" GSM 11.11 could be approved by SMG as a purely editorial change to the existing version. This happened at SMG#6 in late March 1993.[26]

### *13.5.3 Phase 3 and Other Issues*

The new style GSM 11.11 had been agreed by SIMEG#31 in March 1993 for presentation to and approval by the SMG plenary. This meeting was also the end of an era. Gérard Mazziotto who had chaired the SIM Expert Group for a good 5 years guiding it through its years of infancy, resigned as he had announced at the previous meeting. The author who at the time worked for GAO, a subsidiary of his present company Giesecke & Devrient, was elected the new SIMEG chairman by the SMG1 plenary in Düsseldorf in April 1993. He held this position until the closure of SMG9 in March 2000.

Time had shown that, in particular, the technical issues of the SIM-ME interface were a specialists topic. At SIMEG#32 the new chairman could report that an agreement with the SMG1 chairman had been reached "that CRs which do not affect the functionality of the SIM and are of a technical nature may be presented directly to TC SMG (once they have been passed to the SMG1 chairman and PT12)[27] without them being presented to SMG1", a first step towards SMG9 which was established a year later.

After phase 2 there was phase 3. By July 1992 most phase 2 topics were well advanced and SIMEG#27 compiled a list of phase 3 issues it intended to work on, for comment by SMG1. The main outstanding topic of phase 2 was the specification of the 3 V SIM-ME interface. This reappeared in the list for phase 3 together with a third format (again), relationship between GSM service and UPT services and payphone applications based on the SIM. Phase 3 was never realised nor was the third size or the payphone applications. The success of GSM made such applications superfluous. Phase 3 and the intended further phases became over the summer of 1992, phase 2+ to emphasise the fact that the specification of GSM had been completed with the completion of phase 2 and that everything else was just on top of this and optional. The 3 V interface was, however, considered an exception and eventually approved as a phase 2 specification.

## 13.6 The World's First Low Voltage Smart Card Specifications

Who should take the initiative to introduce 3 V technology: SMG, TE9 or industry? This

[25] SIMEG 146/92: Report of the 1st meeting of the Alignment Group, London, 1-3 December 1992.

[26] SMG#6 saw three different versions of GSM 11.11. The CRs resulted in version 4.6.0, the new style GSM 11.11 was then 4.6.1 to which a CR was agreed resulting in version 4.7.0.

[27] The ETSI project team PT12 provided the technical support to TC SMG and its sub-technical committees.

query to the question asked by the parting chairman at SIMEG#31 of whether it was time for a subgroup of SIMEG to specify a low voltage interface, was answered at the following meeting. The formal work item for phase 2+ was agreed at that meeting and approved in June 1993 by SMG#7. Though the work on the new specification was progressed well in several ad-hoc meetings it took until July 1995 for GSM 11.12 *Specification of the 3 V SIM-ME interface* to be approved by SMG#15 in Heraklion as the world's first low voltage smart card interface specification. The reason for this delay was backwards interoperability.

The new 3 V SIMs would work at both 3 V and at 5 V. At which voltage level should a SIM be activated by a mobile supporting both 3 V and 5 V at the interface to the SIM? This, at a first glance, not too difficult question, became a very major issue. From a long-term view it made sense to activate all SIMs at 3 V. SIMs with chips operating at 5 V only would just die out. Only if failing to activate a SIM at 3 V, the mobile would try again at 5 V (if the mobile supported this frequency). What about even lower voltages in the future? Would 5 V damage a 1 V chip? So why to prolong the use of a 5 V interface? The problem at the time was however that some of the "old 5 V only" SIMs would accept an activation at 3 V and the operating system of the SIM would write information in the non-volatile memory of the chip during this process. The question was whether this information would be correct as the low voltage (3 V) may not have been sufficient to produce the necessary charge to program the memory cells. The decision process involved several questionnaires sent to chip manufacturers and endless discussions at SMG9 and SMG. The long-term solution prevailed only in the end. The original decision taken in mid-1995 to reset a SIM at 5 V first, was turned over in May 1996 at SMG#21 against objections by several operators and SIM manufacturers. The reversal had been caused by a compatibility issue. ISO/IEC had finally come up with a draft for the low voltage interface and this mandated, differently to earlier versions, to activate a card first at the lower of the voltage levels supported. Other (new) arguments were that the number of potentially endangered SIMs had decreased and that the problem existed anyway for 3 V only mobiles (though this was not a new argument). The number of potentially affected SIMs seemed to be small in comparison with the long-term advantages. Indeed, no major problems in the field were reported to SMG9.

Having a 3 V SIM specification did not mean having 3 V SIMs. The technology was not quite keeping up with the standardisation. The delivery of quantities started in mid-1996, well after the early and optimistic announcements of some chip manufacturers. By that time the number of GSM subscribers had reached 30 million and far more 5 V only SIMs had been delivered to the market. The idea behind the introduction of 3 V technology at the SIM-ME interface had been the transition of the mobile industry to an all 3 V mobile. To have a charge pump just for the interface to a 5 V SIM was not an appealing thought to mobile manufacturers. Could on the other hand all these GSM subscribers be "forced" to replace their old 5 V SIMs when buying a new 3 V (only) mobile? When should 3 V only mobiles be allowed in the market? This question was discussed at all political and technical levels. In the end, it boiled down to commercial issues between operators and mobile manufacturers. The mass introduction of 3 V only mobiles was well after the date set by the European commission for the protection of the consumers.

Less than 1 year after the introduction of 3 V SIMs to the market, SMG9 started with the work on the next generation of low voltage interfaces. GSM 11.18 *Specification of the 1.8 V SIM-ME interface* was approved as a phase 2+ specification by SMG#28 in February 1999. This time the question was not at which voltage level the mobile should reset the SIM; SIM

software engineers had learned their lesson. The question was whether the new 1.8 V smart card chips will have to work over the whole range from 1.8 to 5 V, or just at 1.8 and 3 V. The implications for GSM would go beyond the immediate commercial (and logistical) effect that SIMs with a 1.8/3 V chip would not work in (old) mobiles supporting only 5 V at the interface to the SIM. There is a growing smart card market outside the world of mobile communications. Those smart cards may have to support 5 V as the (fixed) terminals may not support a lower voltage for years to come. This would imply a segregation of the supply market with the obvious impact on price and availability.

## 13.7 Phase 2+ and the New Specifications

Phase 2+ saw the introduction of new features in GSM 11.11 and the development of several new specifications which were going to change the role of the SIM. As these features are optional their introduction in the "field" was not always a success.

An example of such a feature is service dialling numbers. They are similar to abbreviated dialling numbers with one major difference, the operator determines who can change these numbers and how. Some envisaged applications saw the operator "selling" (part of) the memory space of the SIM to other companies for just a certain period of time and then "re-sell" the space and update the numbers over the air. The idea to specify a separate data-field for service dialling numbers had already been presented to SIMEG in December 1992 but was not taken up by SMG1. Some operators introduced this feature a few years later by storing their service numbers in the data-field for the abbreviated dialling numbers and, in breach of GSM 11.11, did not allow the user to update them. Neither solution was a success. The non-specified implementations confused the user or the mobile, depending on the reaction of the SIM to an attempt by the user to update the numbers. The standardised feature had been introduced too late (January 1996) and the support by mobiles was limited.

A successful and heavily used new feature were and are the group identifiers, better known as "SIM lock", which were introduced formally in January 1995. "Two reasons are given for this feature: one is to prevent MEs which have been stolen, from being used, and the other is to stop people from getting a subsidised ME by signing up for a subscription with no intention of honouring the agreement."[28] Such an ME would read the contents of the group identifier field in the SIM and, if this did not contain the expected coding, would just refuse to work. The specially coded SIM would however work in any "normal" ME. It would thus have been more logical to talk of a "mobile lock" rather than a "SIM lock". The subsidy aspect of the feature called the European Union to the scene. After long discussions and several meetings, the wording in the requirement specification was clarified which had, however, no effect on the implementation of the "lock" or its use.

An important technical improvement was the so-called interface speed enhancement which was introduced in the specifications in October 1995. A major drawback of the SIM-ME interface had been its fixed (and low) data rate depending just on the frequency of the clock provided by the mobile driving the chip in the SIM. Multiples of the ratio clock/baud rate were now allowed. This new technical feature proved particularly useful for the value added services to be introduced a few years later.

There are numerous other "singular" phase 2+ features which have been taken up by the market. We will, however, limit the remainder of this chapter to the new specifications. The

[28] SMG9 42-1 rev1/94: Meeting report plenary no. 1/94 held in Dublin and 1/94 bis held in Düsseldorf.

impact of one of the new specifications, was far beyond any presumption. This is, for instance, manifested in the firm believe that a phase 2+ SIM, though there is no such SIM by definition, is a SIM supporting the SIM application toolkit specifications.

### *13.7.1 The SIM Application Toolkit*

The idea of using the SIM as a personal computer which acts on information received over the air was first discussed within SIMEG as early as 1991. It was suggested that a SIM supporting the advice of charge service would act "pro-actively" and refuse to work if the value stored in the SIM had been used up. The SIM would at each update check the accumulated charges stored by the mobile in the SIM against the maximum value available to the user. As soon as the accumulated charges reached or exceeded the pre-set value in the SIM, the SIM would refuse to process the next authentication request. As a consequence, the mobile would drop the call and no further calls were possible.[29]

The other building block of the SIM application toolkit is "data download". The Telepoint subscriber Identity Module Expert Group (TIMEG, see paragraph 7.1 below) discussed at its eighth meeting in May 1991 a document[30] which describes a mechanism for downloading and storing sensitive subscriber and network data into the TELEPOINT Subscriber Identity Module (TIM) or handset in a secure way using public key cryptography. Two years earlier, SIMEG#9 saw proposals to use protocol transparency and end-to-end connections between a SIM (or the mobile) and a remote service centre to offer additional services to the user or to remotely control the keyboard or display of the mobile. No conclusion was reached at the meeting. GSM 02.17 did not contain a service requirement and ISO/IEC, as the body responsible for the international standardisation of a smart card, was considered to be a more appropriate place for such a general feature. The topic was revisited a few times with no prevail.

The time was just not ripe for standardising such an approach, the SIM was still seen as a secure storage device and not as a "pocket computer". The ideas were, however, further developed on a proprietary basis by a number of operators. Downloading data such as the subscriber's MSISDN number into the SIM over the air, or creating a new data-field in the SIM to support services which were not available when the SIM was originally programmed, soon became a reality. Though these services were by comparison with today's applications rather simple, they required operator specific mobiles and SIMs, limiting the potential market. The first approach to overcome this situation was the development of the Common PCN Handset Specification (CPHS) in the early 1990s by some DCS 1800 operators. Unfortunately, the use of this document was restricted to a group of operators and the document did not find its way into SIMEG or SMG9.[31]

#### 13.7.1.1 The Standardised Approach

To exploit the full potential of these ideas, tools and mechanisms needed to be standardised on a broad basis. In late 1994, SMG9 finally started work on the these topics. It soon became

[29] SIMEG 120/91: Report of the Ad Hoc Group "Advice of Charge".
[30] TIMEG 26/91: Public key cryptography and "Over The Air Registration".
[31] Some CPHS features were incorporated into Release 4 of the USIM specification and subsequently into Release 4 of GSM 11.11 in early 2001.

apparent that it would be beneficial to merge the two work items "pro-active SIM" and "SIM data download" to a (single) SIM execution environment. The SIM application toolkit was born.[32] A year and a half later, the first version of GSM 11.14 *Specification of the SIM-ME interface for the SIM application toolkit* was approved at the 50th plenary meeting of GSM/SMG in Bonn in April 1996. GSM 11.14 defines a set of commands and procedures which are complementary to those specified in the basic SIM-ME interface standard (GSM 11.11) for "normal" operational use. Applications designed in accordance with this specification do not need any special mobiles, they just have to support the functionality of the (SIM) toolkit. (Most people refer to the specification as the SIM toolkit or even toolkit.) Examples of these tools include the provision of local information such as cell number and timing advance, the setting of timers in the mobile equipment, the interaction with a second card reader to, for example, load money over the air into an electronic purse card, the support of (colour) icons, call control and sending of short messages to communicate with network applications.

### 13.7.1.2 Applications

The ideas for issuer specific toolkit applications allowing issuer differentiation in a highly competitive market are certainly too many to list them all. Three typical areas are location dependant services, mobile banking and Internet access.

*Location services* can be used to provide the user with, for instance, information about the films shown in the vicinity. The SIM application requests the ME to provide the area information and then sends a short message to the network requesting all the films shown in that area or just those whose title was given to the SIM by the user. The communication between the user and the SIM via the display and keyboard of the mobile equipment is part of the interactive SIM toolkit application. This service can be extended from a purely informative one to one where the user not only orders the tickets but actually "pays" for them on the spot using the same short message service. The actual payment method used, be it a virtual account with the operator in a pre-paid scenario, through the normal telephone bill, or in combination with a payment institution, as well as the technical realisation lead to interesting aspects of mobile commerce and its feasibility.

A key requirement for successful *mobile banking* services is a comprehensive security solution and this is what the SIM can provide. Such an application would typically allow the user to check the balance of the account and transfer money from their account to any other account by means of a short message set up by the SIM toolkit application in an interactive (mobile equipment independent) session with the user. As in the example above, the SIM controls the display and derives all information necessary from input received from the user. Clearly, money transfer requires a high level of security. So the access to the SIM toolkit application needs to be protected. This could be achieved by a separate banking PIN which the user is requested to key in. Without such a valid PIN, the SIM will refuse access to the application. This is, of course, not sufficient for protecting the actual transaction. The short messages containing the information need to be protected. A typical solution would be the enciphering of the contents of the short message using triple DES, a method commonly used in the banking world. The keys would be subscription specific, only known to the SIM and the

[32] SMG 488/95: Status report of SMG9 at SMG #15, Heraklion, 3-7 July, 1995. This document contains as an annex a first description of the SIM application toolkit. Of interest is, in particular, also another annex on the interoperability issues with respect to the introduction of 3 V technology as discussed above.

bank. When the short message centre of the network operator receives such a message, it cannot decipher the actual contents, as the operator is not in possession of the keys. Instead, the message will be forwarded to the bank which deciphers its contents. If, in addition, a message authentication code and a counter against replay attacks are used, the bank also checks and validates them prior to executing the money transfer (or refusing to do so). The bank could then send a ciphered message back to the SIM informing the subscriber of the successful (or not) execution of the payment. This way end-to-end security between the SIM and a server in a bank can be realised without anybody in the information chain being able to eavesdrop or interfere with the information without this being noticed.

While in the previous examples the applications are residing on the SIM, a *SIM Internet browser* provides a generic means for active Internet communication and the provision of the required application information on a case by case basis. This has the advantage that the application itself is not static but depends on the actual contents of the web pages and the databases residing on the Internet. These and thus the application presented to the subscriber may be changed without any modification being required to the basic application on the SIM itself. Applications up and running today include on-line brokerage which again requires a high level of security.

One could argue "why not use WAP for such purposes?" as this or similar services will, in the future, provide greater computing power especially in conjunction with, say GPRS. One clear advantage of the SIM is its security. The (operator issued and controlled) SIM can store and handle (subscription specific) security data and run the relevant security processes required, in particular, in financial transactions or applications involving data privacy, as the SIM is a secure device, "personal" to the subscriber. The question is thus not "either WAP or SIM application toolkit" but "WAP and toolkit and how to find the right form of interaction".

### *13.7.2 Securing Toolkit Applications, the First API and CTS*

To achieve a common, high level of security for all these applications, a joint working party of SMG9 and SMG10, the GSM security committee, started work on a new specification in late 1996. The aim of GSM 03.48 *Security mechanisms for the SIM application toolkit*, which was approved by SMG#24 in December 1997, is more a design and an implementation guideline than a rigorous down to the bit coding instruction. It does, for instance, not mandate the use of specific algorithms as different applications may require different solutions. An important part of application security is secure administration, in particular when it is done over the air. A downloading mechanism based on the open platform originally developed by VISA was therefore added in November 1999 as an amendment.

Loading of applications into a SIM requires a programming interface. This is no problem if the SIM vendor has written the code for the application as the code will, naturally, work with the SIM vendor specific operating system. To achieve interoperability between SIM vendors with the aim that one and the same code runs on all the cards of all vendors, SMG9 developed an Application Programming Interface (API) for the SIM application toolkit. The functional requirements defined in GSM 02.19 *SIM Application Programming Interface (API) – stage 1* are now "language neutral" and applicable to all APIs to be developed for the SIM. The stage 2 documents, i.e. the implementation details, had to be language specific and would have to be based on existing work. SMG9 could not develop its own API. With the support of the

Java™ [33] Card Forum, an industry organisation to promote the use of Java™ for smart cards, SMG9 developed GSM 03.19 *SIM Application Programming Interface (API) – stage 2 – (Java™)*. The first version was approved by SMG in mid-1999, the publication was however delayed for an outstanding IPR issue. Java™ is, of course, not the only language on which a SIM application toolkit API could be based today. Other candidates are MULTOS and Microsoft. Standardising a second or even a third API was, at the time, considered to be counterproductive to the idea of having a standard one. This opinion, which was very much supported by MoU SCAG, the smart card application group of the GSM MoU, prevailed until mid-2000 when the 3GPP USIM group agreed on a work item for a MULTOS API. This has now been combined with a proposed Microsoft API for a C-language binding. A specification does, however, not automatically guarantee interoperability between the solutions provided by different vendors. The discussion about writing an SMG9 test specification for GSM 03.19 fell into the time when the work was about to be transferred to 3GPP. The USIM group took up the issue and developed a test specification for certain parts of the API as outlined below.

CTS is not CTS. One uses a SIM while the SIM is subjected to the other. The use of a SIM in the cordless telephony system is specified in GSM 11.19 which was completed and approved in February 1999.[34] So far no such SIMs have been delivered to the market as the system itself has not been deployed. The same can be said about the DAM cards. In 1996, there were millions of SIMs in the field but no test specification for the SIM itself. On the other hand there was a conformance test specification for the DAM though there were (and are) no such cards. In October of that year agreement was finally reached on developing a test specification for the SIM. Re-inventing the wheel was never part of the "scope" of SIMEG and SMG9. So the test specification GSM 11.17 *SIM conformance test specification*, the first version of which was also approved by SMG in February 1999, was based on the DAM document.

## 13.8 The Changing Role of SMG9

The role of SMG9 as the group dedicated to just the SIM changed with the success of GSM itself and its future was largely determined by three events:

- the closure of ETSI TC Integrated Circuit Cards (TC ICC) in June 1998;
- the creation of the 3GPP in December 1998;
- the need for a common smart card platform for all (mobile) communication systems.

### *13.8.1 Broadening the Scope – a Variety of Specifications and TC ICC*

The early 1990s saw the creation of a number of smart card committees which developed specifications for particular telecommunication systems as well as for general telecom purposes. Within ETSI, smart card specifications were developed for DECT, TETRA and UPT.[35] Though all these specifications were closely related at some stage to GSM 11.11 or even derived from it, incompatibilities could not be ruled out. The documents had evolved over the years under the responsibility of different committees.

[33] Java is a registered trademark of Sun Microsystems.
[34] GSM 11.19 CTS SIM for FP and MS (FP is the fixed part or home base station).
[35] Digital Enhanced Cordless Telecommunications, TErrestrial Trunked Radio, Universal Personal Telecommunications.

There were also national activities such as the specification of the TIM for the cordless telephony system CT2 (Birdie) of German Telekom. The TIM was based on the SIM and by July 1991 a fairly comprehensive specification had been developed in co-operation with industry. TELEPOINT did however not advance beyond the (card-less) field trials and no TIMs were ever delivered.

The European Norm EN 726 *Telecommunications integrated circuit(s) cards and terminals* series of standards was developed by ETSI in collaboration with the European Standards Committee (CEN). This standard is usually referred to by the name of the ETSI committee having developed the series as the "TE9 standard" (Terminal Equipment, Sub Technical Committee 9). GSM 11.11 and EN 726 were developed in parallel and the relations between the two groups feature in nearly every SIMEG and SMG9 meeting report for several years from late 1989. The spirit was, however, more of a rivalry than a co-operation. This was to some extent caused by the intended use of EN 726 as the core document for all telecommunication smart card applications, and all of these applications were supposed to be based on EN 726. It is interesting to note that in the mid-1990s quite a few GSM operators asked for SIMs to be compliant with EN 726, a request which could not be satisfied for technical reasons. Removed from the direct exposure of the market, EN 726 had evolved more towards a European standard competing with the International Standards of ISO/IEC in this field but specifying, at the same time, detailed application specific features.

The situation of a number of (not necessarily compatible) specifications lead to the formation of the Card Experts Group (CEG) by ETSI in late 1995. Its task was to analyse the various smart card specifications developed by ETSI committees, to "Develop a specification for a common hardware and software platform..." and to "Influence ETSI card groups to introduce phased chances in order to align card specifications towards an enlarged common platform". This group reported to TC SMG and was, after four meetings, elevated to a Technical Committee, TC Integrated Circuit Cards (TC ICC). The very nature of the work of TC ICC was part of the reason for its failure. Companies were not providing enough resources as there were too many parallel activities in the field of smart card standardisation and the usefulness of the analysis also dwindled away with time – the SIM had become the dominant product. The lack of industry support meant the closure of TC ICC in June 1998. Most of the work programme was transferred to SMG9 which, in recognition of this, changed its name from "SMG9 SIM Aspects" to "SMG9 IC Card Aspects".

Among the documents inherited by SMG9 was the technical report containing application identifiers. Such identifiers are used in a smart card to inform the terminal of the applications residing on the card and how to find them. This document was updated to contain the relevant GSM information and became the ETSI Technical Specification TS 102 220 *Application identifiers for telecommunications applications*.

As part of its extended mandate, SMG9 developed the previously mentioned new specification for the administrative phase of IC cards. This contains the commands and functionality typically used for the personalisation of a (SIM) card prior to its issue as well as for remote administration of, say a SIM, over the air. The document was approved by SMG#31 in Brussels in February 2000 as TS 102 222 *Administrative commands for telecommunication applications*.

### *13.8.2 Reducing the Scope – The Transition to 3GPP*

The 1998 agreement of Standards Development Organisations of Europe, Japan, Korea and the USA[36] to jointly develop a mobile communication system for the next, the third generation (3G), created new committees and new working structures. It also created a mix of feelings among GSM experts – from "enthusiastic" to "we are better off on our own" and "it won't work". The work of the Third Generation Partnership Project (3GPP) was going to be based on GSM and ETSI's work on the Universal Mobile Telecommunications System (UMTS). It was thus obvious that at least the UMTS part of SMG's work program would be transferred to 3GPP. The outright willingness to share the results of 10 or more years of "their" work with a much larger community and for a queried advantage was not that widespread at the working group level. The question of whether 3GPP would be short-lived was certainly there and discussed.

The 3GPP had created four Technical Specification Groups (TSGs) to specify Service and System Architecture (TSG-SA), the Core Network (TSG-CN), the Radio Access Network (TSG-RAN) and Terminals (TSG-T) of the new system. The need for a working party to look after the UMTS SIM of SMG9 was outlined in a paper presented at the first meeting of the TSGs in Sophia Antipolis in December 1998. This document[37] also contained the position paper of TC SMG on the USIM, revised by SMG#28 in February 1999 to emphasise the point that the UMTS SIM is a removable module, and a proposal for the terms of reference of a new working group within TSG-T to deal with the UMTS SIM. This new group became TSG-T3 (USIM).[38] The detailed functional requirement specification for the USIM elaborated by SMG9 was the first specification to be transferred to T3:

> The USIM (UMTS SIM) of SMG9 became the USIM (Universal SIM) of T3.

Prior to the closure of TC SMG in July 2000, when all (remaining) GSM specific documents were transferred to 3GPP, only four other SMG9 specifications changed ownership.[39] The reasons for this, compared with other committees, relative slow process were manifold. T3 was developing its own core specifications for the USIM. They were based on GSM 11.11 but technically and from a service point of view different in a fundamental way. Though some of the key players in SMG9 also attended the T3 meeting, it has to be acknowledged that initially the overall know-how in T3 was not at the same level as that of SMG9. Not all companies sent their most experienced people, some saw this more as a training ground for their younger experts. This attitude did change during the first year and T3 established itself as a competent group in its own right.

### *13.8.3 The New Challenge*

"Considering that SMG9 has years of experience as the custodian of a widely used mobile

[36] The Third Generation Partnership Project Agreement was signed by ETSI (Europe), ARIB and TTC (Japan), TTA (Korea) and ANSI T1 (USA) on 8 December 1998.

[37] TSG#1 063/98: proposal for USIM working party in TSG terminals (source: SMG9 chairman, SMG9 UMTS WP chairman).

[38] TSG-T TP-99019: Draft term of reference for TSG-T WG3 (produced by T3#1).

[39] SMG9 248/99: Transfer of specifications from SMG9 to 3GPP (SMG9#19, Munich, September 1999); the proposal is based on the agreement of SMG9 officials reached in Munich during the total eclipse of the sun.

Case 5:26-cv-07551-NW Document 77-11 Filed 05/13/26 Page 33 of 40 PageID #: 5475



telecommunications smart card specification, it is proposed that SMG9 extends its role to act as the central focus point for all next generation telecommunications smart cards."

This statement agreed by the 16 delegates to the 2G/3G SIM, USIM & R-UIM officials meeting held on 1 November 1999 in Austin, Texas, was going to change the role of SMG9 altogether. It was also an expression of the trust SIMEG and SMG9 had built up over the years in the world as a group dedicated to the advancement of smart cards and their use in mobile communications. The sentence is contained in the Committee Correspondence[40] which was sent as an output document of that meeting to all the major players in the telecommunications sector involved in specifying the use of a smart card for their systems.

The document continues: "SMG9 should be invited to extend its scope and take the role of managing common aspects of mobile telecommunication smart card in the following areas:

- the physical interface specifications;
- the common logical interface;
- file ID allocation (DFs) at the common level, respecting existing directory structures;
- shared data that is technology independent (e.g. the phone book).

The specification of the structure and content of the technology specific files, procedures and protocols will remain in the domain of the formulating standards committee."

The meeting also identified several requirements which had to be satisfied before SMG9 could take on the new role. These were discussed in detail at the follow-up meeting in Rome on 17 January 2000. By then, nearly all committees had already responded in a positive way to the Committee Correspondence endorsing the approach, with the remaining groups following suit as soon as they had had a meeting at which the issue could be discussed.[41] The report of the Rome meeting further identifies several specifications of common interest and contains a detailed list of the necessary requirements mentioned above.

The proposal was, of course, a topic at the SMG9 plenary meeting held in Rome during the remainder of the same week. SMG9#20 welcomed the initiative and stated that it would be happy to take on the new role.

The matter was then brought to the ETSI Board which in February 2000 agreed in principle to the change in responsibility of SMG9. One month later on 29 March 2000, the ETSI Board created "newSMG9" as the successor to SMG9. As a first step, "newSMG9" was going to be an ETSI Project focusing on the elaboration of technical specifications for a common platform.

To facilitate this work, the chairman of the "newSMG9" was encouraged to exercise the chairman's rights to invite participation from companies involved in the standardisation work for mobile communication systems in 3GPP, 3GPP2, ARIB, GAIT, T1P1, TR45 and others to be identified. As a second step, it was intended to transform EP "newSMG9" into a kind of partnership project similar to the 3GPP. The ETSI Board further agreed that the location of venues of "newSMG9" should reflect the distribution of participants and that all "newSMG9" documents were to be freely available on an open area on the ETSI server. As the common specifications developed by EP "newSMG9" would be published as ETSI Technical Specifications they would no longer have a GSM specification number, another requirement expressed at the Rome meeting. So, SMG9 had ceased to exist.

[40] Meeting document 006/99 (SMG9 0012/00): Committee correspondence on "common mobile telecommunications smart card standard".

[41] SMG9 0116/00: Report of the (U)SIM R-UIM officials meeting #2, Rome, Italy, 17 January, 2000.

## 13.9 The Universal Subscriber Identity Module

The first meeting of T3 (USIM) was hosted by ETSI in January 1999. The meeting was convened by me and I was elected chairman at the second meeting a month later. A major topic at the first meetings was whether the USIM was a removable module. GSM delegates considered this to be a matter of fact. This view was, however, not shared by all delegates. Not everybody considered an open terminal market to be an advantage for the operator. The issue was finally resolved at the plenary meetings of TSG-T, TSG-SA3 and TSG-SA in Fort Lauderdale, in March 1999, where it was agreed that the "USIM is a removable hardware module like the SIM is for GSM".

The new setting also provided the opportunity to look at the SIM with the experience of more than 10 years and to create a new tool not totally bound by backwards compatibility issues and the limitations of the past. Though one could not start from scratch, it was the chance to move from a mono-application SIM, supporting value added services as part of the GSM application, to a true multi-application USIM supporting independent applications which can even run in parallel.

To facilitate this approach, T3 was going to concentrate on the completion of the requirement specification and the timely development of the new core documents. TS 21.111 *USIM and IC card requirements* was approved by TSG-T in April 1999 as its first deliverable. At the same meeting, TSG-T agreed to the proposal of T3 to split the core specification into an application-independent part and an application-specific part. The goal had been set and the workload was enormous. T3 was going to have 11 plenary meetings in 1999 to develop the Release 99 editions of the two core specifications TS 31.101 *UICC– Terminal interface; physical and logical characteristics* and TS 31.102 *Characteristics of the USIM application.* As priority was given to these two documents, work on the 3G version of the SIM application toolkit (GSM 11.14) did not start before the second half of that year. Despite this late start, the USIM application toolkit (TS 31.111) was published as part of Release 99.

### *13.9.1 The Split of GSM 11.11 and Multi-application*

The proposal to split GSM 11.11 into a lower layer part and an application specific part had been discussed within SMG9 for some time, and a work item was approved by SMG#29 in Miami in June 1999 as part of SMG9's mandate on generic IC card standards for ETSI. The original idea was to combine, in a new specification, the sections of GSM 11.11 describing the electrical and mechanical characteristics, with the two low voltage SIMME interface specifications GSM 11.12 (3 V) and GSM 11.18 (1.8 V). This way, all physical interface parameters were contained in one document which could then also be used by applications other than GSM, a step towards reducing the incompatibilities between potentially competing and diverging standards.

The work was not advanced in SMG9 but was brought into T3. There the work item was expanded to include the general logical characteristics and commands as well as the underlying security scheme of a smart card as required for a true multi-application platform adhering to the OSI layers. In such an environment it would, for instance, be possible to have on the card a number of 3G applications (even from different operators) and, say a banking application. Different to applications employing the (U)SIM toolkit, the banking application would not require the 3G interface of the terminal for communication. It could use

the terminal's infrared, Bluetooth or other interface for communicating with, for example, a cash register in a supermarket (while the terminal may not even be logged onto a 3G network).

When talking of the SIM, people usually do not distinguish between the hardware, the "SIM card", and the application itself. The SIM is just everything, the card and the application. The SIM, being in essence a mono-application (card), could well be identified with its "carrier", the IC card. With the new concept, there was now a clear separation between the underlying hardware and logic on one side, the UICC, and the application specific details as, for instance, defined for the USIM.

GSM: SIM = physical card + GSM "application" (GSM 11.11)
3G: UICC = physical card and basic logical functionality (TS 31.101)
and USIM = 3G application on a UICC (TS 31.102)

UICC was originally an acronym for "UMTS IC card". The incorporation of the ETSI UMTS activities into the more global perspective of 3GPP required a change of this name. The analogous change as for the USIM was, however, considered to be a bit too pretentious by T3. So the term UICC is now just a term for the carrier as the platform for multi-application.

In a multi-application environment the terminal has to know which applications are contained in an IC card and, therefore, a way of selecting them. This is solved for the UICC by the introduction of application identifiers which are stored in a specific (standardised) file together with a path to the application itself. In general, it can be said that the new 3G specifications were aligned with the international standards of ISO/IEC whenever possible. As the selection by application identifier is not known to existing GSM mobiles, the operating system of the card has to take care of this scenario for the case that the 3G card "contains a SIM" as a separate application. This is done in a similar manner to the technique used for ensuring backwards compatibility with DCS 1800 mobiles when DCS 1800 was abolished as a separate application on the SIM.

A major issue for multi-application cards is secure access to independent applications and their interworking. The example of two USIM applications from (potentially) different operators residing on a UICC and sharing the phonebook may be an extreme case, the design of the security architecture has to be laid out for this and has to specify the behaviour if a PIN securing access to an application is blocked by wrong PIN entries. There are several possibilities as to how the security system should react and to which applications access will be denied. The other extreme would be a universal PIN which works at card level and allows access to all applications. As the choice of the particular scheme is up to the card issuer a very elaborate PIN management system had to be developed.

### *13.9.2 New Features and Specifications*

The most prominent new feature is probably the phonebook. This goes well beyond the functionality of Abbreviated Dialling Numbers (ADN) and associated names known from GSM. The "second name" entry for a number provides the user, for instance, with the possibility to store the second name in a different language even using a different alphabet. Additional numbers can be linked to an entry for storing associated fax numbers and e-mail addresses. Numbers can be grouped using group names to reflect say, the association of the

respective person to an organisational unit in a company. It is also possible to have "hidden" entries which means that the name corresponding to a number is not shown on the display of the terminal. It is of course also possible to check and synchronise the entries against an external database. Clearly, memory may be an issue if one wants to support all of these features. Five hundred entries with all their respective associate information would use all the (programmable) memory of today's smart cards.

Records for incoming and outgoing calls are another new feature of the USIM which was also specified for Release 99, the first release of all 3G specifications. This release contains, of course, all the basic functionality of the USIM application such as the security provisions and the transmission protocols. As already mentioned, a terminal compliant with the 3G specifications has to support both transmission protocols T = 0 and T = 1, while a USIM has the choice of communicating using either protocol.

3G security is quite different from GSM security. As part of the enhancements, mutual authentication and sequence numbers were introduced. In addition to the authentication of the USIM to the network, the network now has to authenticate itself to the USIM counteracting false base station attacks. To achieve the operation of a USIM in a 2G network, conversion functions were introduced. The complex issue of the case when the USIM application provides GSM specific parameters in order to access GSM radio networks as well as the co-existence of a GSM and a USIM application residing simultaneously on a UICC are described in detail in a technical report on SIM/USIM interworking.[42]

As part of its work for Release 4, which constitutes the second release of the 3G specifications which was finalised in early 2001, T3 incorporated in the USIM specification several features of the Common PCN Handset Specification (CPHS) developed in the early 1990s by the PCN operators for DCS 1800. The new features are:

- storage of the full and short name of registered PLMN to supplement those in the terminal;
- the name of the home network operator for display when roaming on "partner" networks;
- inclusion of files for voicemail, message waiting and call forward indication feature.

The major new feature for the USIM Application Toolkit (USAT) was the introduction of Bluetooth as a bearer independent protocol for local links. This allows (U)SAT applications to communicate with local devices using the local connectivity capabilities of the terminal. As no input had been received on other candidates such as RS232, IrDA and USB, their specification is left for future releases.

A work item only partially completed for Release 4 is the toolkit interpreter. Proprietary solutions for a SIM resident microbrowser had been deployed by several operators. To improve the market acceptance of secure Internet access by means of a microbrowser and to allow interoperability between (SIM) vendors, T3 started work on this multi-part specification in mid-2000. While the functional specification was completed for Release 4 and approved by TSG-T at its meeting in March 2001,[43] the documents on the overall architecture for such a system and the specification of byte codes for efficient access are still under development.

[42] TR 31.900 SIM/USIM interworking (Release 99 version approved by TSG-T#12 in Stockholm, June 2001).
[43] TS 22.122 USAT interpreter; stage 1.

### *13.9.3 Test Specifications*

The need for accompanying test specifications and the lack of resources in T3 for their development was pointed out early during the specification of the core documents. In October 1999, T3 proposed to set up a funded task to adapt and extend the SIM-ME interface tests contained in GSM 11.10 and the SIM Conformance Test Specification (GSM 11.17) to fit the requirements of UICC and USIM. Once the funding had been approved by the 3GPP co-ordination body, it was towards the end of the financial year, and after another few months to find the experts to do the job, the three specifications covering Release 99 of the UICC and the USIM were completed in a very timely manner.[44] In all developments, the definition of tests and their elaboration as well as the testing itself seem to be a major obstacle.

This becomes even more of a problem if some documents cannot be referred to as there is a question about them being "publicly available", resulting in either testing only part of the spectrum or in re-inventing the wheel with an enormous effort. TS 11.13 *Test specification for SIM API for Java™ [45] card* was developed to check the compliance of applications with the Application Programming Interface (API) specified in GSM 03.19. The test specification, which was approved for Release 98 in March 2001, contains test cases for interoperability at the application level, it does, however, not include test cases for interoperability at the SIM API framework level.

### *13.9.4 The Transfer of Documents to the Smart Card Platform*

TS 31.101 *UICC – Terminal interface; physical and logical characteristics* was a platform specification and as such not specific to 3GPP nor to GSM. It was thus natural that in June 2000, following the agreement within 3GPP on a common approach for smart cards, TSG-T endorsed its transfer to EP SCP, the new committee responsible for specifying a smart card platform. Clearly, the accompanying test specification (TS 31.120) had to follow suit. It was transferred after its first release in March 2001 together with the 3GPP specification for application identifiers (TS 31.110). The latter has in the meantime been merged with the equivalent ETSI document so that there is now only one such document in the telecommunications area. The transfer of other documents to EP SCP such as the specification of a general API (GSM 02.19) is under discussion.

## 13.10 The Smart Card Platform

The first meeting of the committee created as the central focus point for all next generation telecommunications smart cards was still dominated by the SIM. The change in name and status did not relieve the group of its obligation to maintain and update those SIM documents not yet transferred to T3. The promotion to technical committee level with the right to approve its own specifications created an interesting situation. EP "newSMG9" was at the same level as TC SMG to which SMG9 had previously reported and which had the final say in the approval of changes to the GSM specifications. As an interim solution, it was agreed

[44] TS 31.120 UICC-terminal interface; physical and logical tests; TS 31.121 UICC-terminal interface; USIM application tests; TS 31.122 USIM conformance test specification (all approved by TSG-T in December 2000).

[45] Java is a registered trademark of SUN Microsystems.

between the two chairmen in early April 2000 that newSMG9 would still report to SMG with respect to changes to the SIM specifications.[46] At that time it was already commonly expected that TC SMG would be closed by the middle of the year and that the ownership of all GSM specifications, including those for the SIM, was going to be transferred to 3GPP.

"newSMG9" continued in the spirit of SMG9. Its first meeting took place in Visby, on the island of Gotland in Sweden, from 22 to 24 May 2000, as had originally been planned for the 21st SMG9 plenary meeting. Apart from its work on the GSM specifications, newSMG9 drafted its terms of reference, discussed proposals for an appropriate name to replace the interim solution of newSMG9 and looked into a way to handle the transfer of the UICC-terminal interface specification (TS 31.101) from T3 to itself. The search for a new name and the typical quest for the acronym to be a meaningful name resulted in quite a few, in general funny proposals. They ranged from Smart Card Open Application Platform (SOAP) via Cards Dedicated to Mobile Applications (CDMA) to Smart Card Platform (SCP). The last one was eventually selected by the second plenary meeting as it best reflected the scope of newSMG9[47]. This meeting, now referred to by EP SCP #2, also elected the author, who had convened the first meeting as interim chairman, to be its chairman.

Corrections and enhancements to the platform specification, now referred to as TS 102 221 *Smart cards; UICC-terminal interface; physical and logical characteristics* reflecting in its title its origin as a T3 document, constituted a major part of the work during the first meetings. These changes were often complex in nature to safeguard the multi-application approach. True multi-application clearly requires applications to run in parallel. A user would not accept being cut off in the middle of a call or loosing the network connection with subsequent log-on and authentication procedures, just to pay at the check-out in a supermarket. To allow several applications residing on a UICC to be open and executable at the same time, logical channels were introduced in early 2001 as the last outstanding Release 4 feature. Four applications can be open at the same time using securely and independently the interface of the UICC to the terminal. This makes paying in a supermarket while making a phone call a reality, subject, of course, to the provision of the infrastructure and application providers such as network operators and banking institutions agreeing on issuing a "joint" smart card.

The core part of the smart card platform has been established. Also completed is, as already mentioned, the document on application identifiers derived by merging the respective documents of ETSI and 3GPP. Of great importance not only to the telecommunications world, is the recently completed specification of a *generic* Card Application Toolkit (CAT). Though based on the (U)SIM Application Toolkit documents it is independent of the specific applications for which those were written. Work on generic API issues and secure messaging is in full progress. Work to be started includes the specification of a PKI platform and general security aspects, further enhancements to the administrative specification, improvements to the UICC-terminal interface as well as application management. To advance all these topics EP SCP has created three Working Parties dealing with Architecture, Security and Toolkit/API.

The interested reader is invited to monitor the work of EP SCP and of TSG-T3 (USIM) by logging onto the ETSI server.

[46] newSMG9 170/00, SMG 239/00: Future Organisation of Smart Card Work (4 April 2000).
[47] EP SCP#3 9-00-0402: Terms of Reference of EP SCP (ETSI Project Smart Card Platform).

Case 5:26-cv-07551-NW Document 77-11 Filed 05/13/26 Page 39 of 40 PageID #: 5481


## 13.11 Outlook

In January 1998, SIMEG/SMG9 commemorated its 10th anniversary at its 50th plenary meeting. The motto of the event summarised the efforts and the result of the first 10 years:

Billions of Calls
Millions of Subscribers
Thousands of Different Types of Telephones
Hundreds of Countries
Dozens of Manufacturers...

and only one Card: The SIM

Since then, the USIM, based on the new smart card platform, has been introduced, taking on the role of the SIM. The idea of the removable module, which developed from a security device to a secure platform for value added services and now into a platform for true multi-application smart cards, facilitating a global terminal market and ensuring the security of the system, proved to be the right one in the light of the last decade. The increase in computing power, going to 16 bit and 32 bit processors, memory becoming “abundant” (compared with the early days), the ongoing developments in the two committees on topics such as the use of public keys, extended administration and remote management of the card, standardised interpreters for Internet access and use of additional bearers for communication show that we are in a process of further advancing the smart card towards a personal mini-computer.

**Acknowledgements**

The author would like to thank Nigel Barnes and Michael Sanders for reviewing drafts of this document.

# GSM AND UMTS

## The Creation of Global Mobile Communication

*Edited by*
**Friedhelm Hillebrand**, *Consulting Engineer, Germany*
*with contributions from 37 key players involved in the standardisation work for GSM and UMTS*

**GSM (Global System for Mobile communication) provides a service to more than 500 million users throughout 168 countries worldwide. It is the world market leader serving 69% of all mobile digital users and is currently evolving into UMTS (Universal Mobile Telecommunication System).**

By describing the critical decisions and the phases of the development this key text explains how the GSM initiative became a success in Europe and how it evolved to the global mobile communication system. Initially the strategy and technical specifications were agreed for Europe and the subsequent evolution to a global solution was achieved by incorporating all non-European requirements. A new global organisation was created which allowed all committed parties worldwide to participate. The process started in 1982 and the first GSM networks went into commercial service in 1992. The first UMTS networks are expected in 2002 and the fourth generation discussions have begun.

- Presents a complete technical history of the development of GSM and the early evolution to UMTS
- Clarifies the creation of the initial GSM second generation system in CEPT GSM, the evolution to a 2.5 generation system in ETSI SMG and the evolution to the Third Generation (UMTS) in ETSI SMG and 3GPP
- Covers all of the services and system features together with the working methods and organisational aspects

*GSM and UMTS* provides an interesting and informative read and will appeal to everyone involved in the mobile communications market needing to know how GSM and UMTS technologies evolved.

VISIT OUR COMMUNICATIONS TECHNOLOGY WEBSITE!
**http://www.wiley.co.uk/commstech/**

ISBN 0-470-84322-5
9 780470 843222

The accompanying CD-ROM provides nearly 500 reference documents including reports of all standardisation Plenary meetings, strategy documents, key decisions, the GSM Memorandum of Understanding and the report of the UMTS Task Force.

WILEY
wiley.com